GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS

--------------------------x

IN THE MATTER OF:              :

                              :

KENDALL NESBITT               :

--------------------------x

Washington, D.C.

Tuesday, April 4, 2006

The above-entitled matter came on

for hearing, pursuant to notice.

BEFORE:

    TONYA    BUTLER-TRUESDALE,    Hearing

Officer

APPEARANCES:

    On Behalf of the Student/Parent:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

P. DALTON, ESQ.


On Behalf of the D.C. Public Schools:

RASHEEDA WILSON, ESQ.


This transcript was produced from an audio CD provided by D.C. Public Schools.


P-R-O-C-E-E-D-I-N-G-S

HEARING OFFICER BUTLER-TRUESDALE:

Today is April the 4th, 2006, and this is an administrative for Kendall Nesbitt, whose birth date is listed as -- I have it

somewhere.

MR. DALTON:  11-1-84.

HEARING OFFICER BUTLER-TRUESDALE:
Oh, thank you, 11-1-84.  And our last
hearing was on February the 14th.  I remember
it being in A1.  I don't remember the time.
But in any event, we are going to have a
little pre-hearing conference with respect
to petitioner.  This hearing was convened
for 1:00, and petitioner and his mother have
not arrived yet.

I'm joined by Rasheeda Chapman,
who is counsel for DCPS, Mr. Dalton, who is
with Dalton, Dalton and --

MR. DALTON:  Houston.

HEARING OFFICER BUTLER-TRUESDALE:
-- Houston.  And of course, petitioner's
counsel, Fatmata(ph) Berry(ph).  Now you're
Fatima, okay?  All right, Mr. Dalton.

MR. DALTON:  Yes, according to
Ms. Ross, at the MDT resolution type of
meeting that was held subsequent to the last
hearing that we had; a plan for Kendall's
graduation was presented to the student.

The student accepted the plan.

Then Ms. Presley asked for the student to step outside. The student and Ms. Presley talked for a while. The student came back in, folded his arms and sat motionless for the rest of the meeting. But Ms. Presley indicated that he was rejecting the plan that the student just accepted.

Therefore, I'm requesting that the hearing officer, absent counsel, make in inquiry into (inaudible) student, as to what his feelings are; what was discussed between him and Ms. Presley. Was he forced into giving up his plan to graduate this year?

And I'm trying to think  I'm pretty sure this is the first time I've made a request in over a thousand hearings. It appears on the surface at least, given the student's body posture and actions, and the way he was adamant (inaudible) completely inadamant afterwards, that he was sending a clear message that he wasn't happy.

He will be 22 years of age. I think that his considerations should be given far greater weight than a situation where you might have an 11-year-old child,

and the child needs residential treatment
and doesn't want to go.

And as adults, we all sit around
and decide that the child does have
(inaudible).  First of all, Kendall is much
older, and second of all, we're not talking
about that type of situation.  We're talking
about a situation where the child was given
--

HEARING OFFICER BUTLER-TRUESDALE:
Mr. Dalton, I pushed the red button and this
is not archiving.  I noticed when you were
speaking into the mic it wasn't (inaudible)
in front of you.

MR. DALTON:  Can you hear me now?

HEARING OFFICER BUTLER-TRUESDALE:
I hear you (inaudible).  It's on the tape,
but it's not on the -- I'm sorry, it's on
the CD, on this box, but not on the --

MR. DALTON:  But not on the CD?

HEARING OFFICER BUTLER-TRUESDALE:
Right.

MR. DALTON:  All right.

HEARING OFFICER BUTLER-TRUESDALE:
Okay, so let me indicate that where in my

notes?

        MR. DALTON:  Want me to start over?

        HEARING OFFICER BUTLER-TRUESDALE: I think that would be most helpful.

        MR. DALTON:  All right. Subsequent to the last hearing, and prior to the --

        HEARING OFFICER BUTLER-TRUESDALE: I want to do the whole thing over because -- okay, this is the matter for Kendall Nesbitt, whose birth date is November the 1st, 1984.  We are reconvening a hearing that was scheduled -- that actually convened and was scheduled for February the 14th, 2006.

        Today is April the 4th, 2006.  I'm joined by Rasheeda Chapman, counsel for DCPS, Fatmata Berry, counsel for the petitioner, and  Mr. Dalton, counsel for Friendship Edison Charter School.  Mr. Dalton?

        MR. DALTON:  Yes.  Subsequent to the previous hearing and prior to today, an MDT resolution meeting was held where the student was presented a plan whereby he

could graduate --

       HEARING OFFICER BUTLER-TRUESDALE:
It's still not (inaudible).  I got to call
them in.  It's still not -- I'm sorry.

       (Whereupon, the above-entitled
matter went off the record.)

       HEARING OFFICER BUTLER-TRUESDALE:
Okay.  I think possibly the -- Ms. Presley
is this -- I'm sorry.  Yes, I just want to
ask a few questions, first.  Ms. Presley is
listed as one of your witnesses.  I saw her
on your --

       MR. BERRY:  Yes, I wasn't going
to call her because (inaudible).

       HEARING OFFICER BUTLER-TRUESDALE:
Say that again?

       MR. BERRY:  The notes that Mr.
Dalton disclosed (inaudible) that wasn't
even met.

       HEARING OFFICER BUTLER-TRUESDALE:
Yes.

       MR. DALTON:  Well, there's no way
to convey non-verbal (inaudible)
communications from my notes.

       MR. BERRY:  Okay, if I may

respond?

HEARING OFFICER BUTLER-TRUESDALE: Sure.

MR. BERRY:  Okay.  Friendship is trying to sort of not address their responsibility as far as Kendall is concerned, and as far as (inaudible) is concerned.

They want him to graduate, even if he's not ready, so that if he graduates, he's no longer eligible, even though there's an order stating the amount of faith, and therefore he needs compensatory education.

The way Mr. Dalton put everything, they were offering this reasonable plan for Kendall, and everything was going to work out for Kendall.  But just like the notes indicated, what Friendship was offering for all those years of non-faith was for him to go back to Friendship and do a summer; a couple of summer classes and have him graduate, and that was the comp ed for him.  That was completely (inaudible).

A student who is functioning such

as Kendal is, yes, he may feel like he wants

to graduate; we all know that, but he

doesn't have enough credits to graduate

right now.

HEARING OFFICER BUTLER-TRUESDALE:

So let me make sure I know what you're

saying.  He was going to graduate and then

come back for the summer classes?

MR. BERRY:  No, he can't

graduate.

HEARING OFFICER BUTLER-TRUESDALE:

Okay.

MR. BERRY:  He can't graduate.

He doesn't have enough credits right now to

graduate.

HEARING OFFICER BUTLER-TRUESDALE:

Okay.

MR. BERRY:  So what Friendship

wanted, was for him to go back to Friendship

Edison, which was -- we already determined

it's not appropriate for him; for him to go

back there and take those classes that he

needs to graduate, so that he can graduate.

And to Saturday class or something to that

effect; a summer class for him to attend so

that he can take the B.C. history. And I
think they had to figure out whether or not
one of the other courses could be taught, or
is being taught at Friendship.

HEARING OFFICER BUTLER-TRUESDALE:
Yes.

MR. BERRY: That's why Kendall
has representation of people who understand
what is being done. What -- what did happen
was a break was taken for it to be explained
to him exactly what it is Friendship is
offering. Because all he's hearing is
graduation.

HEARING OFFICER BUTLER-TRUESDALE:
Yes.

MR. BERRY: But he does want to
do his plan. He wants do his vocation and
stuff, but he doesn't understand that in
order for you to do that, somebody has to
pay for it. You're not just going to go.
And the discussion with Kendall was not even
with Ms. Presley. It was with me, because
they called me and told me what was
happening in the meeting.

So I spoke to Kendall, and I

explained to him the entire issue, which is this is what they're saying, they want to do for you. It's not design. It's not vocational. Once you graduate, they're done with you.

HEARING OFFICER BUTLER-TRUESDALE: Yes.

MR. BERRY: So whatever it is they may owe you or not owe you does not really matter once you get out. And I said, "Do you understand that?" And he said, "Yes." And I said, "Well, if all you're focusing on is graduation, and you don't want the other stuff." "Yes, I do, Ms. Berry." I said, "Well, then do you want to go back to Friendship? That didn't work for you. Do you think it's going to work for you now?"

And his feeling was how he felt when he was there before, which is it wasn't working for him. And as his representative, it's my job to make sure that Kendall understands the whole process. And I made him understand the whole process.

Going back to Friendship is not

exactly what's best for Kendall, okay? He's

not going to get what he needs on his IEP,

which is the intensive services that he's

supposed to get. Just because he's going

there to get the credits to graduate, his

IEP shouldn't be implemented until he's

exited out of it.

He has been exited out of it, and

my only problem is that Mr. Dalton is making

as if we're forcing this student to make a

decision, and for -- I don't know what

benefit we'll be getting out of it, because

obviously I'm not going to get anymore if he

goes vocational, than if he goes to

Friendship. But he will be harmed. It's as

simple as that.

And the offer, to me, is

ludicrous, knowing that for the entire time

he was there, he really didn't make

progress, and it's clearly documented. And

it's been determined that what was done at

Friendship, was not beneficial to the

student. And for Friendship to come and

say, "Okay, for the last three years, we

didn't really help you. Let's give you a

couple of classes in the summer for comp ed,
and you graduate. Then we'll see about
that."

That's pretty much what it --
what it ends up being. And that is what is
happening here. It's as simple as that.

HEARING OFFICER BUTLER-TRUESDALE:
What -- what -- what was the suggestion that
petitioner's counsel put on the table at the
MDT meeting? Or did you all put it in --

MR. BERRY: Yes, it's in the
notes.

HEARING OFFICER BUTLER-TRUESDALE:
Okay.

MR. BERRY: Okay, it was that he
returns to High Roads in the fall, and does
a half day because he only needs a certain
amount of credits. He doesn't have to be
there all day. He does a half a day. He
goes to the professional program as a form
of comp ed for him, so that when he gets
out, he has a trade. He has something he
can use to have a life.

HEARING OFFICER BUTLER-TRUESDALE:
Is that the only alternative?

MR. BERRY:  It's -- it's in the
notes.

HEARING OFFICER BUTLER-TRUESDALE:
What notes?

MR. BERRY:  Disclosure
(inaudible).

HEARING OFFICER BUTLER-TRUESDALE:
Was that the only alternative presented?

MR. BERRY:  Right, or they just
(inaudible) because he can't graduate this
year if he doesn't have enough credits
unless he goes to Friendship Edison.  And I
believe that wouldn't be appropriate for
him.  It's already been determined that
Friendship is not appropriate.  Friendship
cannot implement this IEP.

HEARING OFFICER BUTLER-TRUESDALE:
That's where I'm getting confused.  When you
say he cannot graduate this year unless he
goes to Friendship Edison, he's going to be
taking Saturday and summer classes.  So he's
still not going to graduate even if he goes
to Friendship Edison.  He's not going to
graduate this year?

MR. BERRY:  But that --

MR. DALTON:  He will in the summer.

MR. BERRY:  That's what they're saying.

HEARING OFFICER BUTLER-TRUESDALE: Oh, he'll graduate at the end of the summer?

MR. DALTON:  There's 23.5 credits (inaudible).  For all of our lack of (inaudible).  So he only needs three credits.  Ms. Berry sounds like, "Oh, he needs all this work."  No, he doesn't.  He needs three credits.  And unless I have misread the law, he's going to get all of this great vocational school for two months?

MR. BERRY:  If I may?

MR. DALTON:  Come on, please.

MR. BERRY:  Okay.

MR. DALTON:  There's another motivation here other than what we've covered.

MR. BERRY:  Anyway, what I said previously.  What has been indicated?  This has been dragging on for a very long time.

HEARING OFFICER BUTLER-TRUESDALE: Let me just -- I know.

MR. BERRY:  This is hurting him.

HEARING OFFICER BUTLER-TRUESDALE:
I know.  I want you all to get it all out,
but I just want to -- my next question is
what -- do we have any recent grade
equivalency levels I can look at to
determine whether or not they're still in
the demonstration of -- anything more recent
than the last thing I looked at?

MR. DALTON:  You know, the
problem with all of this --

MR. BERRY:  I don't think so.

MR. DALTON:  -- is that he's in a
full time placement.  And it's not a full
time placement.

MR. BERRY:  Okay, but we've used
that.  That should solve all those years --

MR. DALTON:  Well, now wait a
minute.  I mean the law does not require us
to give the Cadillac.  I mean and that's
what she's asking for.  The law requires
that the student graduate with a high school
diploma.  That's what -- that is the
standard.  Not all this other stuff.

HEARING OFFICER BUTLER-TRUESDALE:

But I got his attendance records, but I
don't remember getting any grades.  Where
are the grades?

        MR. BERRY:  They should've been.

        MR. DALTON:  I didn't get the
information either.

        MR. BERRY:  She said she faxed
it.

        HEARING OFFICER BUTLER-TRUESDALE:
Yes, she gave me the attendance records and
not the grades.  Because I remember I broke
-- I had -- I just had one --

        MR. DALTON:  We asked for these
documents at the resolution meeting, too,
and I didn't get them.

        HEARING OFFICER BUTLER-TRUESDALE:
I don't see anything in here on it.  Now,
the other thing that I wanted to say, and I
think I put it in this pile.  I hope I was -
-

        MR. BERRY:  And if I may --

        HEARING OFFICER BUTLER-TRUESDALE:
Go ahead.

        MR. BERRY:  -- just for the
record?

HEARING OFFICER BUTLER-TRUESDALE:
Yes, ma'am.

MR. BERRY:  (Inaudible).

MR. DALTON:  Just need to have
them wait outside for a moment.

MR. BERRY:  (inaudible) for all
this that he's done, he's earned so many
credits.  Are they the same ones that came
to this hearing and indicated that he wasn't
there for a whole year?

HEARING OFFICER BUTLER-TRUESDALE:
Yes.

MR. BERRY:  And he failed all his
classes.  The problem -- the problem that
always gets faced with children in special
ed is they may get all these "credits," but
still have not really -- don't really know
anything, or are not really learning
everything that the credits are supposed to
be saying they're learning.

And we all know people graduate
from high school functionally literate, so
let's not use that as a yardstick to
determine that Friendship does such a good
job that now he has 20 credits.  But a fact

remains that credits; it's not a determinant as to whether or not you were provided a free, appropriate public education.

Yes, he's in a full time private school, definitely. And he's getting what he needs to get. But he didn't get what he would've gotten. And because of that, he's not where he probably would've been.

MR. DALTON: How -- how could she say that? The goal is graduation. If he gets to graduate, that's what's required.

MR. BERRY: The goal is to -- as Mr. Dalton has indicated with this hearing, the goal is to get him to where he would've been if you had provided him with the services he needed, as Mr. Dalton has stated several times at this hearing in this particular case. So we cannot now come back and change the goal and the --

MR. DALTON: No one is changing the goal.

MR. BERRY: -- standard to determining the compensatory education that is owed to the student. I'm sorry, this is just a way to avoid providing him with what

he requires, and what he needs, and what is

owed to him. And it's just a fact. We

cannot sit here and allow that to happen,

and that's just a fact. And it's not going

to be two months, as Mr. Dalton has

indicated. Because what we're looking for

is simple; between now --

          MR. DALTON: He ages out.

          MR. BERRY: If he can -- if he

can start getting --

          MS. CHAPMAN: He already got it.

          HEARING OFFICER BUTLER-TRUESDALE:

Let me -- let me -- let me let Ms. Chapman

know why she's stil sitting here. Because

she wants to know why she's still sitting

here. I think that --

          MS. CHAPMAN: I do have a motion

for the record.

          HEARING OFFICER BUTLER-TRUESDALE:

You have a motion for the record? I'm going

to let you put your motion on the record,

all right? But let me -- let me say this:

I -- this case has just drawn out forever

and ever and ever, and I did not anticipate

that we would be here on this date dealing

with this.  But I will take responsibility
for that in that I think that I probably
could've drafted the initial order more
tightly.

I wanted to do it on an interim
basis because I thin I just didn't have the
certainty about petitioner, because I wasn't
sure -- and I believe I stated that at the
initial hearing; chicken-egg, egg-chicken.

MR. DALTON:  Yes, yes.

HEARING OFFICER BUTLER-TRUESDALE:
You know?  I just --

MR. DALTON:  Whether he was going
to be able to come into school.

HEARING OFFICER BUTLER-TRUESDALE:
Right.

MR. DALTON:  And that's why you
said such a --

HEARING OFFICER BUTLER-TRUESDALE:
It's coming to school.

MR. DALTON:  ***14:31t2.

HEARING OFFICER BUTLER-TRUESDALE:
And I didn't think I was in a position to
make a finding of fact that it was the
environment or lack of support, or whatever,

whatever; whole laundry list of blame thems

that created the environment that didn't

support petitioner, or he -- I just didn't

know.

So I thought that if I did an

interim order and monitored his attendance,

I might be able to make some nexuses to

whether it was his behavior, or disability,

or the environment feeding into a

disability, whatever.

It appears that he -- I think I

can say from the attendance records that he

demonstrated some will. When I broke down

the numbers, he was absent approximately a

little less than 15 percent the way I broke

it down. I wasn't crazy about the numbers,

but it certainly was better than what I saw

in the previous record.

My review of the grades just a

moment ago indicate that he is making some

progress. There is some behavioral things

that he's working out. But even his

demeanor in the last hearing was a lot

better.

Now, I think the reason I didn't

want to let you go, Ms. Chapman, was because
I think that here's your show. Because I
think in my last order, which I haven't read
recently, that there was a statement about
Friendship Edison's responsibility for the
High Roads placement, okay?

I don't know that DCPS shouldn't
be the one footing the compensatory
education, because it -- I suspect that his
lack of progress going back to, god, I don't
know how many years, even if we cut it off
at the statute, may have had something to do
with lack of DCPS oversight.

Now, in the order, I said, "hey,
he was at Friendship Edison. They had him
there. They saw." But at some point it is
also DCPS' responsibility in terms of
oversight, especially to me where it comes
to compensatory education at issue.

So that was one of the reasons I
didn't want to let you go at the last
hearing; because I thought we were going to
get to this point then. Because I'm not
certain that any final order that I would
make with respect to compensatory education

would have Friendship Edison on the hook for

it at all, really to be honest with you.

MS. CHAPMAN:  Now, if I'm clear,

the students has been at Friendship Edison -

- was at Friendship Edison for a period of

three years prior to this complaint.

HEARING OFFICER BUTLER-TRUESDALE:

Yes.

MS. CHAPMAN:  So our position

would be that there's no way possible, if

you look at the statutory framework, that

DCPS would be on the hook, specifically for

compensatory education, because there was no

-- if you just look at the time line, there

was no complaint that was filed within the

statutory time line while the student was

attending a DCPS LEA school, that would

require that one establish a denial of fate,

and then said, "The student is entitled to

compensatory education based upon this

denial."

HEARING OFFICER BUTLER-TRUESDALE:

Let me ask Ms. Berry what she thinks about

that before I forget.

MS. CHAPMAN:  Well, okay, and

I'll address the complaint. Because we are bound by the four corners of what was plead, so.

HEARING OFFICER BUTLER-TRUESDALE: Yes. Ms. Berry?

MR. BERRY: Okay. I mean I --

HEARING OFFICER BUTLER-TRUESDALE: You don't care?

MR. BERRY: I just want him to get -- honestly speaking, I feel like I came on this case too late. I mean my age and what I got out of law school; all that stuff.

HEARING OFFICER BUTLER-TRUESDALE: Yes.

MR. BERRY: This, to me, is one of the worst cases I've ever had in all the cases I have, and I have a lot of them. And honestly speaking, I feel for this kid, and I don't care who pays for it. I just want him to get -- because when I look at the record, things that of course I was not able to really put forth; things going way back when that told me back then he would have done really well if he had really

gotten what he needed at that time.

And at the time, yes, he was at DC Schools, but that was -- that was a while -- that was a long time ago.

HEARING OFFICER BUTLER-TRUESDALE: Well, we -- we --

MR. BERRY: When he came to Friendship --

HEARING OFFICER BUTLER-TRUESDALE: Okay, I know where you're going, I think.

MR. BERRY: Right.

HEARING OFFICER BUTLER-TRUESDALE: We've been through all this.

MR. BERRY: Right. So for me, I can say that like I always fashion my complainants, I say SEA is also responsible. But that's -- but that's --

HEARING OFFICER BUTLER-TRUESDALE: Was that in your complaint?

MR. BERRY: I always put it in my complainant. I say SEA discusses --

MR. DALTON: And she didn't discuss the issue of oversight responsibility. She only investigated whether the student was there. If that was

the case, then DCPS would never be liable
and never have to show up for hearings,
because they don't have any oversight
responsibilities. And yet, that's not what
the law says.

MR. BERRY: And what I was trying
to say was at the same time for me, the
reason why I fashion my complainants the way
I do is because DCPS always makes the
argument --

MR. DALTON: Right, like they are
now.

MR. BERRY: -- that they are not
-- they're asking where the student is, and
as a result they're not responsible for the
student unless the charter school told them
of whatever it is that's going on. So my
complainant has to go against the charter
school, and then --

MR. DALTON: Which means
absolutely zero monitoring.

MR. BERRY: (Inaudible) as far as
I know.

HEARING OFFICER BUTLER-TRUESDALE:
Well, let me see -- just hold on one second.

I want to see where they are.

MR. DALTON:  They probably went that way.

MS. CHAPMAN:  If I could just respond to counsel for the petitioner? While I could certainly empathize with her impassioned statements and thoughts about her client, again, I go back to what is -- what is here, and I -- it is certainly the position of the school system.  I mean we have no other method by which to know any -- what is the basis of any complainant if we don't base it on what is in the complaint.

There is not, in the complaint that DCPS as the SEA failed to monitor the student while at Friendship Edison; there's not in the complaint that DCPS -- that there was a situation that would meet the exceptions on a two-year statutory limitation in the complainant.  There is none of that.  When it specifically says --

HEARING OFFICER BUTLER-TRUESDALE: What is in the complainant?

MR. BERRY:  The complainant that I wrote -- DCPS' portion of the complainant

was that they did not convene a 30-day

review for Kendall once he got to High

Roads, which is the port of call when a

child -- they have to do a 30-day review to

see if the child still should be there, or

the progress of -- that wasn't done. And I

--

HEARING OFFICER BUTLER-TRUESDALE:

Was that in my order, or is that statutory?

MR. BERRY: No, that's not in

your order.

MS. CHAPMAN: Nor is it

statutory.

HEARING OFFICER BUTLER-TRUESDALE:

So it's just --

MS. CHAPMAN: It's just practice

that when a child goes to a new placement,

that you try to do a meeting within 30 to 45

days, to assess.

MR. DALTON: I disagree.

Regulations do require -- they don't specify

the date by when the review has to be done.

Practice is only set as to the 30 days, but

not as to the review. The review is

mandatory under the regulations. They

failed to do that.

        HEARING OFFICER BUTLER-TRUESDALE:

Okay. So there was no review?

        MS. CHAPMAN: Not within the 30

days there was not a review.

        HEARING OFFICER BUTLER-TRUESDALE:

When was the review?

        MR. BERRY: And not with DCPS. I

mean High Roads went and took it upon

themselves to convene a meeting, but DCPS

didn't show up for a meeting.

        HEARING OFFICER BUTLER-TRUESDALE:

So is it your assumption that since they

went on and did it, that your obligation was

-- DCPS' obligation was fulfilled?

        MS. CHAPMAN: Well, correct in

terms because the -- the obligation --

        HEARING OFFICER BUTLER-TRUESDALE:

So if DCPS' obligation was fulfilled because

High Roads independently went on and

convened that meeting; then that to me says

that there is some oversight nexus in terms

of when a school fails to perform and DCPS

doesn't act.

        MS. CHAPMAN: When the school --

but if the school -- I mean I think that
that connection is really -- I mean I
understand what you're saying.  Let me just
repeat it to make sure I'm -- what you're
saying: that if -- if our position is that
the fact that a 30-day review took place,
and the 30-day review was by High Road, then
the inverse of that being the fact that
Friendship Edison didn't do what they were
supposed to do; then DCPS has an implied
responsibility?

                HEARING OFFICER BUTLER-TRUESDALE:
Yes.

                MS. CHAPMAN:  And our response to
that would be that the relationship is -- is
different in terms of are the role and the
functions of LEA -- of charter schools, that
are their own LEA is very clearly defined in
the law.

                And in terms of private schools
where DCPS -- where children are placed
there, DCPS is still to monitor them, but
we're also responsible for -- it says, "As
if a child is in a DCPS LEA school."  We're
responsible for evaluations.  We're

responsible for issuing notices of placement; all of those functions that LEA traditionally has.

The opposite is not true. When a child is at a charter school that is its own LEA, DCPS is not only not responsible, but does not have the statutory power to evaluate that student, to go in. It's completely different. The function of the SEA is different than our quasi LEA function in -- excuse me, that was the wrong choice of words. But it's different than our LEA function when the child is at a private school.

So our position is that that nexus cannot be made, and that here, as the case for the student, and it's very clear in the complainant that the student was at Friendship Edison for over three years. That is specifically spelled out in the complainant.

So our position, again, and there's no indication; DCPS is not seeking to change the student's placement. I know that that is a -- in terms of how the

problem can be resolved, it says, "DCPS to
maintain his placement at High Road for the
'05-'06 school year." DCPS is not seeking
to change his placement, and that is
actually the only issue on here in terms of
how the complainant can be resolved, that
DCPS, as our position, is responsible for
and has any authority over, and that we've
not issued a notice of placement. We do not
plan to issue a notice of placement to
anything outside of High Roads.

In terms of compensatory
education, our position would be that we
certainly, as the SEA, have no obligation,
just as we didn't have an obligation to
provide the student his educational
programming, review and revise his IEP on a
yearly basis, we don't have any obligation
to provide, to supplement or take part in,
the compensatory education that the student
may be awarded as a result of a denial of
faith when the child was at a placement;
where that placement's responsibility,
statutory responsibility, was to provide the
student fate.

MR. DALTON: This is a statement that we all remember: 75 unexcused absences (inaudible). So our basic premise was he was not available for instruction. So don't put on us any compensatory education because we could not have educated that student because he did not provide himself to be educated, okay?

So we need to go back to this original premise and original theory that we had in this case. Then we said that a hearing officer can award, as compensatory education, a full-time placement. And that therefore, even if you don't agree with us that he wasn't available, he is getting compensatory ed, because he is getting a full-time placement.

Now, then you have to say, "Is the fact that he's getting this full-time placement any benefit?" Because just because he goes to a full-time placement doesn't necessarily mean he's getting any better education than he would've gotten at Edison, had he attended school at Edison, okay?

HEARING OFFICER BUTLER-TRUESDALE:

Yes.

MR. DALTON:  So we wanted some progress reports.  We wanted to have monthly reports.  None of those were provided.  So there was no way to measure whether in fact there was a delivery of these services, and no way to correct the situation by moving him, by intensifying the services, by providing more one-on-one tutoring.

None of those things were put in place, and now unfortunately, to no fault of Edison, okay but it is unfortunately, we are now at the end of school.  So now, those services cannot be put in.  So why should my client suffer any form of retribution for that?

Now, the other problem we have with this case is, with all due respect to counsel's enthusiasm for her client, the standard she is upholding is her own.  It is not the legal standard.

Now, I would like to see the legal standard be something different for all children.  I would like to say that a

high school diploma for a regular ed student
in a district high school means something.
But the sad fact is that over 50 percent of
the students are illiterate, even with a
graduation.

(Whereupon, the above-entitled
matter went off the record and resumed.)

HEARING OFFICER BUTLER-TRUESDALE:
I'm sorry.

MR. DALTON: That's all right.
And that's regrettable, but just as I cannot
change that situation, I cannot change the
situation that I have to advocate for my
client. What is the legal standard? And
the legal standard is a diploma. Whether
that diploma is worth anything, I can't go
there. I can't go there, okay? Because
that is an impossible thing to fix.

I can't fix that for all of DC
students, for all of the Virginia students
that graduate and are below grade level, for
all the Maryland, for all the West Virginia
students who were in my class when I
graduated when I couldn't read, for my own
brother who couldn't read and got a high

school diploma.

I cannot fix all that. All I can do is -- is talk about what is required under IDEA, and that is a diploma. This child can receive a diploma. We have offered to do all the things that are necessary to do that, even though we're not responsible, just because we think this child deserves a high school diploma and we have it in our power.

And we can sort of make up for what happened to him beyond the statute of limitations. But they don't want to have anything to do with it because they have their own view of what they want for the child, but it's outside the scope of what is required for the child.

So you can go down that road, and I will appeal it up and up and up, and then the court is going to come back and say, "This case has moved. This child is already 22," and the child will have nothing. That's exactly what is going to happen in this case.

HEARING OFFICER BUTLER-TRUESDALE:

Ms. Berry?

   MR. BERRY:  Okay.

   MR. DALTON:  Mark my words.

   MR. BERRY:  Okay.  So I'm sorry,
it's not -- it's not like a funny situation.
It's just the fact that what I'm hearing is
Mr. Dalton pretty much saying he will
(inaudible) appeals, and by the time this
goes to appeals, he's going to be 22, and
that will be it anyway.

   So forget the fact that he's not
going by the law.  What I'm hearing from Mr.
Dalton is pretty much -- I guess I can only
use -- the word that I think is appropriate
is a threat of what would happen if he does
not get the ruling he feels he should have
for his client.  And that is completely
inappropriate.  That is not way decisions
are made.

   Decisions are made based on the
fact there's a law, and what is on the
record.  Not whether or not Friendship
Edison's counsel is going to go through the
process of appealing a decision by a hearing
officer, and as a result laboring the

services that a student needs, which is
completely against IDEA, which indicates
that reason.

And the purpose for IDEA is to
provide the students with appropriate
services so they can function appropriately
in the real world.

HEARING OFFICER BUTLER-TRUESDALE:
Well, let me -- let me -- let me alleviate
part of your concern. I think it's
appropriate for me to do it on the record.
I think it's appropriate.

MR. DALTON: yes, they're coming
in. You can come on in. Other clients are
going to come in, too.

HEARING OFFICER BUTLER-TRUESDALE:
You can do that, too, if you like.

MR. DALTON: Yes, you should feed
the meter.

HEARING OFFICER BUTLER-TRUESDALE:
Let me make sure that all three parties
understand. It's probably beneficial for
all three of you to understand that I am not
a decision writer or a decision maker that
has any pride in whether or not my decision

is upheld.

I will say that I'm cocky enough to think that if I commit it to paper, it was my best cognitive effort at that point. And I don't care whether the court disagrees with me.

I have not been reversed, but should it happen, or perhaps I should say when it happens, I really don't care. I do know that there are hearing officers here who take it personally. That may be a gender difference.

There are other things that I take personally other than whether or not a group of people who have been designated to review my decisions revers me, because I've been in the position of reversing people who make hearing decisions, and many of whom I thought were much greater, much, much greater legal minds than me.

So I don't attach any -- any value to if I write this way, it may be appealed. That's -- that's -- and I wanted to assure you of that; that whatever decision I come to, it will be because -- it

will most likely be because of the

precedence that I think I'm setting, if I

make a decision one way or another.  Not so

much whether or not I think I'm going to be

reversed.

That is the portion of my

decision making process, which is least

detached from Kendall, in that I can't just

make a decision for Kendall.  I have to make

a decision for the petitioners who will

follow him.

So I think it was worth the three

minutes I just spent explaining that the

decision won't turn on whether or not I

think I'm going to be reversed, because it's

just not an issue to me.  I don't care.

MR. BERRY:  If I may, just a

response to Mr. Dalton indicating that if

he's at a full-time placement that's comp

ed.  No, he's not full-time placement

(inaudible) IEP called for a full-time

placement, not as comp ed.  (Inaudible) comp

ed was still in the order, and Mr. Dalton

indicated Friendship was not responsible,

that he was truant.

But the hearing officer found
that even though that argument was made
previously, that it is credible that
humiliation of this failure would exacerbate
***36:12 truancy for clarity.

The fact that he was in a
classroom where he wasn't getting any real
services, he wasn't learning, he wasn't
progressing, affected him emotionally,
tremendously. And that was clearly
indicated at the hearing.

Even Friendship's own documents
at the time indicated what was happening to
the student. And even as indicated here, he
was there for three years, and yet they only
disclosed attendance records for August 25th,
2003. And that, to them, was the indication
of the student not availing himself to an
appropriate education.

HEARING OFFICER BUTLER-TRUESDALE:
Okay. Well, let me -- let me speak to
Kendall now, and his mom. And first of all,
let me catch them up a little bit because
it's not fair that we're like in the middle
of this, and they don't even know why we're

here, exactly what we're talking about.

We entertained -- I entertained a pre-hearing conference since you were going to be running a little bit late, because there was some concern with respect to the IEP meeting where they discussed the compensatory education and the graduation plan, and what may have been this source of your final decision not to approve the plan, which they report to me was initially accepted by you and then later in the meeting rejected, okay?

Now, I'm just going to go on and just take a minute to try to -- because I think you and I, Kendall, since we're still in pre-hearing conference mode, I'm not going to swear you in. But I think you and I have a fairly good rapport, and I want to let you know what -- what I'm weighing, because my obligation to you, as I said at the very first hearing, is to make sure that whatever I decide, you are not surprised. Okay, and I want you, of all people in the room, to have some idea of the factors that I weighed in making a decision for you. Go

ahead.

MR. BERRY:  Being that he just came in, I haven't had a chance to talk to my client.

HEARING OFFICER BUTLER-TRUESDALE: Okay.

MR. DALTON:  I don't want counsel to have a chance.

MR. BERRY:  Counsel had an opportunity to talk to his client, and that's what he came in here with, and whatnot.  But I don't --

HEARING OFFICER BUTLER-TRUESDALE: Okay.  I'm going to give you that opportunity if you need it, but what I'm getting ready to say is not going to prejudice or jeopardize, any counseling that you may want to do.  Matter of fact, I think it would be maybe more helpful for you to wait to communicate with them.

MR. BERRY:  I just want to have that on the record so you know what I wish.

HEARING OFFICER BUTLER-TRUESDALE: Okay.  My initial great concern with you, Kendall, was to make sure that number one,

you didn't give up.  I did not think by any
stretch of the imagination that I could
recoup for you darn near 12 years of
education, especially in the short period of
time that I would've had to monitor this
situation.

I am, frankly to be honest with
you, I'm very, very impressed.  Not
satisfied, but impressed that we've gotten
to the fact where we're discussing
compensatory education.  And I finally got
something with some grades on it that
demonstrates, thank god, to me, that you're
showing initiative; that you're there
approximately I think it was around 85
percent, which is not what I was looking
for, but certainly not something that I
would say does not meet my satisfaction.

What I really wanted to see was
something in the 90s, but I'm not going to
spank you with a two-by-four for that
because it's such a great improvement that
I feel confident that you did not waste my
time, okay?  And that was primarily because
I couldn't make the findings of fact one way

or the other on you.  I really didn't have
enough  to conclusively make findings of
fact that I felt secure in, right or wrong,
appealed, whatever.

I knew I did the best I -- I
didn't have anything to make a decision on,
so I had -- I just felt like I'll see who
does before me, and then I'll just try to
make some connections there.

When we get to -- I wanted to say
to you that when we get to the compensatory
education, there are times when I feel like
the judicial system, and this is not a
judicial process.  This is what's called a
quasi judicial proceeding, but they're
similar.

There are times when the judicial
system can't give you back what you lost,
okay?  If you lose an arm, even if someone
gives you $5 million, your arm is worth more
than $5 million.

With respect to the compensatory
education, what I would like for you to
respond to me is I don't feel like -- of
course I don't feel like you don't deserve

anything.  That's not my feeling at all.
But I almost feel like if we set up
something really expensive for you, and I
have put a definition on extensive, that it
may get in the way.

So what I'm -- and what it may
get in the way of is you starting to make
some decisions on your own, and also
learning now to design what you want to do
next, and make it happen.

Now, that does not -- I'm not
saying that you're ready, just based on two
semesters, that you're ready to be cut loose
and that you're ready to make those
decisions.  But I also feel like statutorily
I can't hold onto you forever, even if I
want to.  And I also feel like -- like too
much effort at that is not good for you.

Because what I'm not going to do
is make you one of my favorite pet projects
and coddle you, and -- and make a problem
for you, just so I can say, "Oh, Kendall was
one of mine, and I kept him and I did the" -
- no, no.  I'm not going to do that because
you've got to stand up on your own two feet

and start to make some decisions that are
realistic, and steo-by-step and gradual,
that you can make happen on your own and
take pride in that.

So I'm really confused right now,
but I wanted to make sure that you
understood that if I said, "Okay, Kendall,
it's time for you to go back to Friendship
Edison. Let's see you beat them and
outperform -- and outperform in terms --
expectation-wise there. Let's see you do
it."

I want you to know why. If I
decided to craft something in between, I
want you to know why I so walked on a middle
ground decision, or chose something that was
in between what your counsel is asking for
and what you were offered by Friendship
Edison.

I don't know how to do that. I
mean over ten days, maybe I might figure
something out, or ask them to help me do
that. But it is possible that I would just
say, "You know what? I'm pushing Kendall
out the nest." Do it and do it now, because

I just feel like the -- the longer I'm

holding onto you, the -- the easier it is

for you to lose that competitive edge that

you have right now, to perform and make it

happen for yourself.

Because right now, you've got all

the initiative. You feel good. You got the

confidence. You got everything behind you

that you need to fly. So basically I didn't

mean to preach at you, but I just wanted you

to know what I was thinking.

Now, do you have any response to

that? How do you feel?

MOTHER: You tell me. Tell her.

HEARING OFFICER BUTLER-TRUESDALE:

Take the mic. Put the mic --

KENDALL NESBITT: In order for me

to graduate, I thought it was necessary if I

was to go through Friendship Edison

(inaudible) if it was requiring me to

graduate on time. That's what I told me

mom.

HEARING OFFICER BUTLER-TRUESDALE:

Well, like your counsel said, this time

thing. You're going to be twenty what not?

KENDALL NESBITT:  Twenty-two next year.

HEARING OFFICER BUTLER-TRUESDALE: You know, this time thing.  What do you mean on time?  Why is that --

MS. JONES:  That's what we've been going back and forth on.  It's because I want him to understand it's good to graduate.  But what I want him to have is if something happened to me today or tomorrow, he could function well without me.

Because there's nobody like your mom.  Once your mom is gone, there's not going to be anybody that's going to hold your hand, take your hand, and make sure you do this and that; make sure nobody is hurting you.  Okay, and he needs to understand that.

And what I want for Kendall is, okay, if he goes back to Friendship Edison, since that's on the table, is there going to be someone there that's going to help him understand?  Because as you see, even though he's doing well here, his comprehension level is still not there (inaudible).