And that's my concern: putting him back in a situation where okay, "I want to learn this. I want to get this." Because I have no clue what they're talking about. Is there going to be someone that's going to break it down for him so he can understand on his level?

HEARING OFFICER BUTLER-TRUESDALE: And before you entered the room, Mr. Dalton raised a point which I'm in full agreement of, and that is to say that this is why I was asking for the status reports, the interim status reports, so that we could address some of those concerns early on in the ball game to gain as much progress as possible during that -- was it approximately a year placement? How many months have we been here, whatever period of time?

MR. DALTON: September, yes.

HEARING OFFICER BUTLER-TRUESDALE: See, because you know, now --

MS. JONES: I mean you're right. He has -- his confidence level is better and he's becoming more involved in different community things. His goal is to be as

(inaudible) going to New York because his friend is there. She has (inaudible). She's trying to get her music career going on. So he has been involved in that.

HEARING OFFICER BUTLER-TRUESDALE: Yes, the world. The world that he wants to be in.

MS. JONES: Yes, exactly. But in --

HEARING OFFICER BUTLER-TRUESDALE: Let me ask this: Have you yourself identified the path that you need to accomplish? Just some intermediate goals, some middle-step goals? Do you know what it is, or where it is that you need to go and do next? What have you been waiting for them to define? What's the next step and going to happen to you? Or have you been doing any charting, planning on your own?

KENDALL NESBITT: I have been planning for college on my own. So -- but when I had found out the news, I (inaudible) stop, but I still want to continue on going with it. But when I found out the new --

HEARING OFFICER BUTLER-TRUESDALE:

Well, just for example, let me just say
this.  Just for example, like if the other
options presented by your counsel was High
Rose part-time, what would you be doing the
other part of the day?  Have you thought
that far out?

                    KENDALL NESBITT:  Working.

                    HEARING OFFICER BUTLER-TRUESDALE:
Where?  Because that's what I'm talking
about:  single-focused; this step will get me
here.  This next step will get me there.
I'm not a career counselor.  I'm not going
to try to take up these people's time doing
that.  But that's what I'm -- that's the
next thing I'm looking for from you, and
that's the -- the -- and that's the type of
coddling that I'm trying to avoid that
disrupts your ability to plan.

                    Because as far as I'm concerned,
how I come down this side, this side, and
the other; that's just so completely
irrelevant to what I'm really trying to do
with you, Kendall, which is prepare you to
make some of your own decisions.

                    I really -- because 18 months

from now, I'll be struggling to remember
your name. I'll know your face, and I'll be
wondering how, what you're doing, but I'll
be struggling to remember your names. And
all except for your mom and your counselor,
the rest of us will be, too

So what I'm trying to make sure
of is that you're ready to do the planning.

KENDALL NESBITT: And the
(inaudible) High Road, I'm going to
vocational school. That's what we
discussed. I had to sit and remember.

HEARING OFFICER BUTLER-TRUESDALE:
See, because I'm looking for you to make the
time to figure out what avenue of vocational
school. Not just to be in vocational
school, but vocational school that suits
your interests; vocational school in a
vocation that understands your make up and
how you learn.

All that takes some time to
identify. And right now, I just feel like
comp ed is come ed, but there is a case that
really requires -- that puts your counsel on
notice that the plan needs to be devised by

them.  And it should be -- it's fairly
intricate.

I think that case requires that,
but we're at a stage where all the other
hearing officers are just coming around to
what I thought that case represented.  I'll
be cocky enough to say that.  Six months
ago; and I was willing to go along with what
they said so that we had some consistency.

So I'm not going to saddle
counsel with Reed right now, but I think
that Reed required your office to put
something in place that would've been
tailored fairly particular to this student.
That's what I really think.

But because, like I said, that
wasn't what the other hearing officers were
practicing and following at that point, and
they're starting to come around a little bit
to what I said six months ago about Reed,
we're here now taking up all this time.

And I will say that I am getting
-- starting to get actually fairly
impressive comp ed from petitioner's
counsel, thank god.  I don't know I don't

want to hold you all any longer than
necessary.

I guess what I really -- now that
both of you know that I'm really looking for
something in the middle of what both of you
offered, because I'm not sure that the High
Roads part-time placement is the best thing
for him, either, because he doesn't have
plans for the rest of the time.  Maybe
that's none of my business.

Is that your best argument?
Because if I were in your seat, I'd say,
"It's none of your business what he's going
to do with the rest of the day."

MS. BERRY:  No, no.  The rest of
the day, that's

PARTICIPANT: I think it is.

HEARING OFFICER BUTLER-TRUESDALE:
I don't know statutorily that as the hearing
officer that it's really any of my business.

MR. DALTON:  Under Reed, I think
it is.

MS. BERRY:  What was indicated,
even at the meeting, was that the rest of
the day would be taken up with design

school. That's what I understood it to me.
And when we spoke, that's what I understood
it to be.

HEARING OFFICER BUTLER-TRUESDALE:
At whose expense?

MS. BERRY: Friendship's, of
course.

HEARING OFFICER BUTLER-TRUESDALE:
Oh.

MS. BERRY: As the form of comp
ed. Friendship is not paying for High Road.
DCPS is. Friendship is trying to use High
Road as a comp ed, but this is part of his
placement at High Road because there was no
full time placement offered for him. That
was the reason for placement at High Road.

The comp ed piece was Friendship
Edison's responsibility. And unfortunately
at the time, they escaped or skirted,
whatever word you want to use, to -- from
doing that.

HEARING OFFICER BUTLER-TRUESDALE:
I'm not going to let you all do this thing
here anymore.

MS. BERRY: Right, but --

HEARING OFFICER BUTLER-TRUESDALE:

Ms. Chapman?

MS. CHAPMAN:  Well, I would just -- just reiterate what I said before in terms of the record, and DCPS' position. And I would also echo the hearing officer's thoughts as to her reading of Reed.  And I've never understood it to be any different than the petitioner needing to be able to provide a plan that demonstrates where the student --

HEARING OFFICER BUTLER-TRUESDALE:

You agree with me?  Okay.

MS. CHAPMAN:  I've never read it differently, nor have I heard a hearing officer interpret it differently.  Just in my dailies, I have seen hearing officer say they do understand that, and then the parties saying, "Okay, well, we will agree to go back to the table to discuss it."  But never have I heard --

HEARING OFFICER BUTLER-TRUESDALE:

For a long time it's just been me and Banks.

MS. CHAPMAN:  Okay, and I haven't had -- right, I think it probably hasn't

been an issue that has been brought before
all the hearing officers.  That may be why
my particular experience is different.

But again, I would just go back
to the complaint and in terms of what
specifically is plead here.  The relief
that's specifically plead, and the alleged
denials and DCPS' inability, nor a statutory
requirement at the time that these denials
took place, to provide a remedy for it.

And so based upon that, our
position is that DCPS is not a party at this
point, because again, I go back to the fact
that the only issue that is listed on here
that affects DCPS is to maintain maintenance
of the placement at High Roads.

There's no -- as I said before,
my client isn't seeking to change that
placement in any way, shape or form.  Now,
if the petitioner decides to do something
else, or as part of a compensatory education
plan for denial of fate while the student
was at Friendship Edison, then that's one
thing.  But DCPS is not issuing a notice of
placement to any place else besides High

Roads.

So for all of those reasons, I
feel as though DCPS is really not a party to
this action, and should not remain.

HEARING OFFICER BUTLER-TRUESDALE:
So what is the vocational program?  I mean -
-

MR. DALTON:  If I could talk for
one second?  Because everybody else got a
chance to speak.  I would like the hearing
officer, before she makes her decision and
writes her decision, to review the opening
comments that I made at the initial hearing.

HEARING OFFICER BUTLER-TRUESDALE:
At the initial hearing?

MR. DALTON:  Yes.  Because what
Ms. Chapman is saying now is exactly what I
said: That this complaint did not comply
with Reed.  That it was an hour-for-hour.
That it was a miscalculation.  They came
back to the table.  They still went with the
hour-for-hour.

They came back and said, "No,
this is the wrong calculation.  You should
give us the 3,000 instead of the 6,000.

We'll be happy." That is not in compliance with Reed at all, okay? So basically, what we did is we did their work under Reed. We came up with a plan that allows him to graduate, because it's specific, and it's what's required under Reed now days, okay?

And the reason that I am so strong on this is because I had a case that was prior to Reed where I was not under the obligation to set out a specific plan. The federal judge issued hour -- or year-by-year. It wasn't -- it was four years, and I was the parents' counsel in that case.

The court of appeals, with the judge who wrote the opinion for Reed, sent it back to Judge Kessler(ph), and we had to do it under a plan where we were very specific. Now, it wasn't Judge Kessler's fault, since the decision was prior to when Reed came out. But then when it was appealed, it was after Reed. Reed sent it back.

So when I came in here, that's the perspective I was coming from. So I knew exactly, because I heard it from the

horse's mouth. He wrote the opinion, okay? And he says that it is the duty of counsel to be very specific. And you can't just throw out the hours.

HEARING OFFICER BUTLER-TRUESDALE: Yes, yes.

MR. DALTON: So at this point, my client cannot be responsible for that. We have come up with something that we're willing to do on a -- not a denial of fate basis, just we're willing to do it, because we think it's the right thing to do. And we will make sure that people are there to help them. But it can't be thrusted upon us, and that's the only thing that I was saying.

I would not even consider trying to make a threat against any hearing officer, let along this hearing officer, because I've been in enough hearings with you that I know what your personality is. But what I'm suggesting is that the law requires me to make certain arguments. And that legally, we are entitled to the benefit of those arguments, and those arguments will be made.

Now, whether I'm right or wrong, I don't really care either. I'm pretty much on the same path you are. I've had cases reversed that I thought were correct, and then congress comes around and says I was right to do. It doesn't make any difference; I still lost the case even though I was right.

It doesn't matter to me. I've been doing this too long. What is important is that this student needs to graduate.

HEARING OFFICER BUTLER-TRUESDALE: Yes.

MR. DALTON: So is he going to graduate? Or are we going to kind of play around with this, and he gets whatever you decide? Which is fine. That's the way it is. All I'm saying is that Reed required a certain thing. I advocated that from the very beginning. It's been a long time.

So if I'm wrong about that, you'll find out, and you'll be able to tell me the opinion. If I'm wrong, I did not do that. But I know I did because I'd just come off that case when we had this case.

And whenever you're going through a transition it's difficult. It's difficult to get counsel to go through. It's difficult for hearing officers. We'll probably have a reversal and (inaudible) approve. They're probably going through some stuff with that, too.

But in any case, I think what you said earlier about Kendall getting 100 percent compensation is not going to happen. It's just not going to happen because you just can't recover all the years of what DCPS did or didn't do before he got to Friendship. That's just because the statute doesn't allow that. But at least our plan provided a means for him to graduate. And if he wants to take advantage of that, fine. If he doesn't, fine, too. But I think it should be his choice. Not other people's choice.

HEARING OFFICER BUTLER-TRUESDALE: Kendall?

KENDALL NESBITT: To your comment, yes, I think you were responsible because I wasted three years asking for help, and you

all wasn't giving it to me.

MR. DALTON:  Okay, and that's a fair argument for you to make.  Our argument was we can't give you an opportunity to be educated if you're not there.

MS. BERRY:  If I may?

HEARING OFFICER BUTLER-TRUESDALE: Yes.

MS. BERRY:  Friendship, Mr. Dalton, is using Reed as far as putting together a plan, per se.  But he's using -- if he's going to use Reed, then at least use the fact that reed indicated to get the student to the level he would've been in if not for the violation.  Not for him to graduate.  Just I don't remember anything in there saying, "Let's have him graduate."

Okay, I may read it wrong as far as the coming here with it not necessarily wrong, but differently as far as coming in here with I guess a satisfactory plan for opposing counsel for the hearing officer. Because what we recommended at the meeting, and what I indicated was simply that we're not saying he's not going to graduate; he

wants to graduate. We want him to graduate.
But we shouldn't push him to graduate this -
- now, especially being that it's not going
to be really honestly speaking right now.

    HEARING OFFICER BUTLER-TRUESDALE:
I got you there. I'm there with you. My
thing is the measurement of the injurious
impact, doing the limited statutory period
that we have, and the fact that Reed, to me,
says you are to give me some guidance in
terms of how I equate what you're asking me
for with that measurement of time.

    MS. BERRY: Right, which is the -
- the -- he would of course still be,
because he has a few credits to complete at
High Road, and at the same time, does his
design vocational program that he wishes
for? Because he does -- excuse me, he does
want to design.

    HEARING OFFICER BUTLER-TRUESDALE:
But it sounds like -- it sounds to me, Ms.
Berry, you're saying, "Give us the design
program as comp ed. Just give it to us."
And I'm saying I need a measure. I need
something that says for this particular

injurious impact.  For example --

        MS. BERRY:  Well, I can have -- I
mean I understand what you're saying.  I
always thought that I needed to have
somebody who can, because the information I
got from High Road was that because of his
cognitive level, even if he graduates,
unless he has an extra training, he more
than likely --

        HEARING OFFICER BUTLER-TRUESDALE:
Okay, now is that in the record any where?
Is there some type of assessment there that
--

        MS. BERRY:  No, High Road is
going to testify, to testify to that fact,
to that issue to address that.  So address
that comp ed issue, which is why should he
have the vocational.  And my witness would
testify as to why he should have the
vocational.

        HEARING OFFICER BUTLER-TRUESDALE:
Because what I think would be -- I'm
thinking, and you can let me know how I may
be askew in this.  I'm thinking that the
comparison, or that the definition of

injurious impact is probably most reliable
coming from grade equivalency coming in to
High Roads, and grade equivalency at this
particular point, after approximately one
school year.

I take the -- and I'm not good
at math; this is why I needed your
interpretation of it. I take the difference
between the two and say, "Well, he could
have, under most ideal circumstances, made
this amount of progress for these three
years; for each year." So he lost in
inverse. He lost this much progress.

And then I have to make a
decision in terms of how much, if at all,
Friendship Edison would be compensating him
in the vocational program that you're
telling me about, for that gap. And I know
that jumbled because I'm not a mathematical
mind. But I think that you can almost do
this mathematically if you have performance
equivalencies at the starting point and the
end point.

And as I've said, and I'm not
going to repeat. You're won't hear me say

it again. I think Reed makes it your
responsibility to provide that to me. Your
offices, not you personally.

MR. DALTON: Is that appropriate
in this case being where we are?

HEARING OFFICER BUTLER-TRUESDALE:
I'm sorry.

MR. DALTON: I mean how many
bites do you get at the apple?

HEARING OFFICER BUTLER-TRUESDALE:
Yes.

MS. BERRY: But okay, coming from
Friendship Edison? Come on. Coming from
Friendship? Come on. Especially where we
are? That's exactly the point. Where we
are at this student coming from where we
were, and where this was. Let's be honest.

MR. DALTON: That's great, but
let's be honest. How does Friendship have
any ability if this year was wasted, to fix
that?

MS. BERRY: What year was wasted?
According to these reports, the student is -
-

MR. DALTON: The reports were

given when we had a chance to collect them.

HEARING OFFICER BUTLER-TRUESDALE:
If it's possible.  Is it even possible, to
your knowledge, for me to get?  Has there
been any grade equivalency tests?  Has there
been any grade equivalency testing done?

MS. CHAPMAN:  I just wanted to
state generally for the record DCPS'
position terms of establishing -- oh, excuse
me.  Thank you.  I just wanted to state for
the record DCPS' position in terms of
establishing the -- the injury, if you will,
and how it can be established on the record.
But for that denial, the student would be
here.

And it's certainly our position,
and I don't think Reed disagrees, that that
is not a determination that can be made by a
lay person, and that you do need to have
experts and specialists that are able to
give an opinion as to -- their opinion
specifically --

KENDALL NESBITT:  I agree with
you, and I heard -- I heard that argument
before, too.  And I don't mean to cut you

off.  I just want to stay on track.

             MS. CHAPMAN:  Okay.

             HEARING OFFICER BUTLER-TRUESDALE:
I heard that argument before.  I agree with
you.  I think that if I impose that, though,
that level of representation, and I due
process hearing, a quasi judicial proceeding
on petitioners, that it will keep them from
being able to present these arguments at
all.

             I mean because I just don't think
that most petitioner's counsel can acquire
the level of expert testimony that you're
talking about if we go down that road.  And
that's why I'm saying just give me some
numbers, and I'll try to squash them myself.
Because I'm just going to throw out a name.
Let's say I got Donovan Anderson's office
coming in here, and we're dealing with comp
ed, or a smaller law firm, solo
practitioner; I just think it's unreasonable
to put that heavy of a burden on petitioner.

             MS. CHAPMAN:  Okay, I mean I
certainly hear and understand what the
hearing officer's thoughts are on that.  I

will just say for the record, though, with all due respect, DCPS, my client, who is traditionally in court opinions and HODs from parent's counsel; I mean we are traditionally slammed for certain things that we do.  And despite that, we still have to put forth our best effort in the end.

As a counsel for the school system, despite what my client may or may not have done in any particular case, I still have to move forward based upon what the law requires, and do the best that I can with the information that I have.

And I would submit that the very fact that Reed is out in this issue has certainly put parent's counsel, not specifically this one, but just parent's counsel as a whole, on notice as to what is going to be required of them in making a case and establishing a case for compensatory education.

So I think that that fact alone -- you know, when we had the change in the law effective July 1st, there was a lot of scrambling.  And then counsel on all sides,

you get it together and you have to rise to the level of whatever it is that either the courts or congress; whatever that bar that they set, as attorneys we have to rise to that level.

And I think that the same thing applies here, whether it be in due process hearings or court; that all of us are held to the standard that has been set in terms of making our cases.

So while I understand, and I can even empathize with -- with what you're saying because I am subject to that also in terms of servicing my client, I just wanted to make that statement for the record. And that's it.

HEARING OFFICER BUTLER-TRUESDALE: Okay. Kendall, I don't -- I never want to come off as overly dramatic. I probably am just a dramatic person, just not even trying, not having that affect. But at this end of the tabel, you're looking at a person with over $150,000 in student loans. I forgot what they even call them. See how far --

MR. DALTON: You're trying to really push that back.

HEARING OFFICER BUTLER-TRUESDALE: Yes, I don't even know what it is. Who was that? $150,000, so that doesn't serve you well. Because I feel like you're appreciated if you pay for it. At some point, you're not going to be finished with your goal without incurring some debt on your own.

You got -- again, I said you got to do the research and figure out where you want to be. I'm willing to bet you the place that you need to be, the ideal setting that you need to be in; neither one of them can identify for you, or pay for.

You've got to start looking as to where you want to be. And the other thing is to get a job is going to be less difficult for you than for many people to get a job in their field of interest that you're interested in. Connect and finish up the work on your behavior and your attitude.

Take a deep breath before you let anybody like me, and you know people like me

are running around, make you angry.  Coming
up to the counter talking about, "Ring me
up.  Ring me up now."  Stay focused and
don't let people like me get you derailed,
okay?

I'm saying that because I need
for you to stay single-minded on a goal.
See it; live, breathe, eat that, and you
will make it.  You can -- you can do this.
I'm tired of giving you advice.  I know I
don't need to give you anymore.  But what
I'm most trying to prepare you for, because
I don't have again what I want before me,
and that's not her fault.

The law is constantly changing.
Depending on who the petitioner is,
sometimes I think there should be more,
there should be less.  So I'm just not even
going to lay all that blame on her.

Possibly if it were another
student with another area of interest, I'd
buy more of her argument.  I'm buying a
little less of her argument because the
vocational component of it, that I think you
need and want, is very particular, and yet

it's undefined here today.

I mean you'd have me probably heart and soul if with a particular vocational plan, or program identified. I'd say, "Well, I can sew this together." I can say, "Okay, from this portion, we'll fund this class." But it's a little too what they call nebulous. It's cloudy, and so I'm a little bit lost.

I don't know that giving -- see, I only have ten days to write your order. I don't know that giving you or your counsel any time to come up with that could be well thought out enough to serve you well, and you actually be able to use it. Ten days is really not the type of time that I'm talking about in terms of identifying what type of program best suits you. Would it be here in DC or not?

So all of that is what I have in my mind, and you realize I'm doing a lot of talking to you because this is about -- not -- it's about mom, because at some point you're going to be writing a check thanking your mom. Really at some point, okay? At

some point you're going to be writing checks
to the nursing home, okay, talking about,
"Yes, mom, be quiet." And then you'll be
right next to each other talking about, "Did
Kendall come by yet?"

So it's more about -- it's less
about what they have to say and more about
me, because I'm preparing you, not for a
completely adverse decision. I just don't
know. But just in case, because you
haven't lost out either way because you have
the confidence to get there, and that's the
key.

Now, in terms of the cognitive
skills and more time, I think that the
additional time at High Roads will serve you
well there. And I'm willing to make sure
that the order says that. It's the
vocational part and what else Friendship
Edison could do to assist you that's really
cloudy for me. Really cloudy.

It's not that I don't think that
they owe you. It's not that I think that
they do owe anymore. I don't know at this
particular point. But even if I found that

they did, I don't have a good suggestion as
to what it is. I can't just tell them to
fund Princeton. I got to have an idea.

          KENDALL NESBITT:   ***36:38.

          HEARING OFFICER BUTLER-TRUESDALE:
Yes, top schools.

          KENDALL NESBITT:   (Inaudible).

          HEARING OFFICER BUTLER-TRUESDALE:
I'm not familiar with Gibbs.

          KENDALL NESBITT:   (inaudible).

          HEARING OFFICER BUTLER-TRUESDALE:
Mister, you have all the information. I
have nothing. I've got ten days to write
the decision. Day late, dollar short.
Don't be day late, dollar short ever again.

          Last thing I'll say to you is the
only reason -- I wasn't expected to do
anything. I was in an elementary school
where they segregated by color, believe it
or not. And for whatever reason, I just
wasn't expected to perform. And in that
instance, my ego did get wrapped up, and I
ended up getting out of that particular
school. And for the rest of my life, I
never forgot that they didn't think that I

was going to do anything because I was
medium to darker brown.

And to get -- I guess out of
anger to get back at them, I decided I want
to outperform all of those lighter skinned
black people that they thought were going to
be the stars, like the pastor's child.  And
that sent me on a frenzy of trying to figure
out who would help me.  Black Student Fund?
Just where was the free money?  Where,
where?

Next thing I knew, I was in one
of the most exclusive boarding schools on
the east coast, Riding School.  Certainly no
one else from my area ever even heard of the
school, much less go to dream to go there.

So come on, do your homework and
channel the anger into identifying where the
money is to get the help, where the
opportunities are.  And don't wait around
for people like me to -- to tell somebody
else to write a check.  Because the program
and stuff that they're going to set up is
going to be so much less beneficial to you
because it's -- it's not going to be as

sincere.  It can't be as individualized as
what you're dreaming for, what you're hoping
for.

        You got to do it on your own.
You got to do it on your own.  And I'm not
going to -- I'm not going to participate in
creating this fallacy that there's an
entitlement program that will work.  There's
an entitlement; whether or not you actually
get what you're entitled to is not promised,
and it doesn't always pan out to be what you
would have benefitted from if you'd gone out
and got it on your own, anyway.

        And also, I'll say I welcome your
counsel to appeal whatever decision I come
up with if it's less than entirely favorable
to you, too.  I'd like to see that, okay?
Because I just have a -- I just have a
feeling, like I said, I'm more leaning
toward forcing you to hit the ground running
now, regardless of whether or not I think
you may be entitled to -- to something else.
Because the plan isn't set, and this will
teach you to take charge of making sure that
the plan is where it's supposed to be when

it's supposed to be there.  Okay?

Finally, if no one else,  and I want to give them all opportunities to say whatever they need to say, but I really want to hear from you periodically.  I may not be here forever, but I will make sure that if I'm not here, that particular counsel who have petitioners that I would like to know about know where to find me.

It's certainly not until after you are out of the system that it would be appropriate for you to contact me personally.  But at that -- after that time, I would let your counsel know how you can find me.  And I would like to know that you didn't lose your incentive.  Okay?  Anybody else have anything?  Yes?

MS. JONES: Am I to understand that this school prepares you for the outside world?  And -- let me get to the microphone.  Sorry -- I don't know what I was saying.  But he made a statement that he's not going to get that.

HEARING OFFICER BUTLER-TRUESDALE: Mr. Dalton?

MS. JONES:  Mr. Dalton.

HEARING OFFICER BUTLER-TRUESDALE:
Thank you.

MS. JONES:  So they don't feel
that they're under any obligation to make
sure that he is prepared for that outside
world.

HEARING OFFICER BUTLER-TRUESDALE:
Well, you know --

MS. JONES:  Is that the same?

HEARING OFFICER BUTLER-TRUESDALE:
I don't -- I want to let him respond,
because your question is more directed
toward him, and I don't -- I don't have a
tendency that I have to defend these people
because I see them everyday.  You'll see me
defend her just because I see them everyday.

But let me say this:  It's more
about -- see, he's able to string me along a
little bit, and I don't know whether I said
it while you were in the room or not.

Only because we had this chicken
and egg scenario that I brought up in the
very beginning of the hearing, which is was
the attendance problem first, or was it the

environment that wasn't supporting
attendance?

I know what I suspect, but it's
such a long time ago. We're talking about
such a long duration of time, that legally,
it's hard -- hard -- each year, it's hard
for me to prove a nexus that is the
environment that does not -- that cannot
suit his disability, and that that caused
the attendance problem.

Each year that we're talking
about, especially that beyond the statute of
limitations; that legal nexus gets mountains
more higher for me to prove.

MS. JONES: Because I addressed
these issues with Friendship Edison when he
was there and they did the IEP. And they
kept telling me that they were going to get
someone, and they didn't, which became a
problem. Because now he's sitting in class
and he's falling asleep, or I'm taking him
to the school when he's walking out the back
door.

HEARING OFFICER BUTLER-TRUESDALE:
But I mean it -- and if I remember from my

reading of the records, because I went

through Kendall's record a little more than

I go through some of the others. And I

remember teachers in elementary school

talking about his availability in class.

MS. JONES: Yes.

HEARING OFFICER BUTLER-TRUESDALE:

So the problem started --

MS. JONES: And I -- I understand

that, and -- but elementary school through

even middle school at Bernie Backus(ph); his

grades were particularly not A+, B, but they

were like Cs. He was doing pretty well. It

wasn't until he got to high school --

HEARING OFFICER BUTLER-TRUESDALE:

But mom?

MS. JONES: Yes. I just want --

HEARING OFFICER BUTLER-TRUESDALE:

They weren't -- that wasn't -- that wasn't -

- especially Cs there, that wasn't good

then, and they were probably just giving him

Cs then because he wasn't a behavior

problem. And I don't know everything.

MS. JONES: No, because he

actually had a tutor.

HEARING OFFICER BUTLER-TRUESDALE:
I'm willing to bet you that that environment
wasn't stimulating enough even then.

MS. JONES:  Yes.

HEARING OFFICER BUTLER-TRUESDALE:
And would not have fostered the foundation
that he needed to succeed and -- and falling
grades even there.

MS. JONES:  Okay, okay.

HEARING OFFICER BUTLER-TRUESDALE:
I'm willing -- I mean I'll go in and --

MS. JONES:  I just have a problem
when someone speaks negatively about one of
my children.

HEARING OFFICER BUTLER-TRUESDALE:
It's just --

MS. JONES:  It's just the mother
-- I understand, but --

HEARING OFFICER BUTLER-TRUESDALE:
And it's your job to do what you're doing
now.

MS. JONES:  And it's my job to
defend my child and to speak up for my
child.

HEARING OFFICER BUTLER-TRUESDALE:

Yes.

MS. JONES:  And I just -- I mean
if there's a way -- there's a way to say
something that's not particularly nice in a
nice way --

HEARING OFFICER BUTLER-TRUESDALE:
And -- and -- and if you did not --

MR. HOWARD:   -- and be tactful.

HEARING OFFICER BUTLER-TRUESDALE:
If you did not defend Kendall, I'd be so
worried, okay?  I mean part of the reason
that I feel confident that when he does find
me and we talk, that things are going to be
as they should be is because he has you.

I don't have children coming here
with parents who are confident to parent
that often.  You are, so I know that
together you all can make some things
happen.

MS. JONES:  Oh, yes, we will.

HEARING OFFICER BUTLER-TRUESDALE:
But again, I hear what you're saying, but
these people are paid to do what -- and
they're paid to do it, I don't know by any
means necessary, but they got to do what

they got to do.

        MS. JONES:  I understand.

        HEARING OFFICER BUTLER-TRUESDALE:
I could be sitting in that chair.  You'd
have the same -- believe me, if they were
writing me a check --

        MS. JONES:  I would say the same
thing to you.

        HEARING OFFICER BUTLER-TRUESDALE:
You're writing me a check?  You'd have the
same feeling, maybe even worse because I
told you, I got the dramatic thing going.
Kendall would think I was the worst thing
from the wicked west by the time you all got
out of here, if they were writing a big
enough check.  I got to eat.

        MS. JONES:  I understand.

        HEARING OFFICER BUTLER-TRUESDALE:
Okay, like I said, you'll have the decision
in ten days.  I don't want to burden you
with trying to come up with what I think
Reed requires, because I don't think you can
do it just in ten days for this particular
petition.

        MS. BERRY:  My only response to

that is it would be difficult with any other student who -- I don't know what I want to do. I'm going to do. I think I want to do this. But that's not the case. He knows what he wants to do. He knows where he wants his life to go, and he's always known that -- ever since I've known him it's been the same thing.

We've always had the discussion "Well, you have to go to school and you have to do this and do that before you can get there." We always did the same consistently. Nothing has changed. It's not a matter of --

HEARING OFFICER BUTLER-TRUESDALE: But you -- you're not going to have acceptance letters yet. You're not going to have anything from those three schools that I can say, "Okay, you fund this now, and let's just call it a day."

MS. BERRY: I know. What I'm saying is I understand he has schools that he's looking at. However, as she said, I mean even regular schools that we applied to -- we don't always get accepted to the

schools that we applied to. But at the same
time, I think that what I prepared for was
what I've always been told; what I needed to
-- to indicate why he needs the comp ed and
all that, somebody who knows him, "blah,
blah, blah."

So that's what I prepared for
today: Who knows him? Somebody who knows
how he's doing in school, and what he needed
to function both academically and in the
real world. So that's what -- that's what I
got to prepare for this hearing. But my
only concern is if something else is
expected or is needed as far as this
particular hearing officer, and I would ask
for the opportunity to present that to the
hearing officer.

And I've always been very
diligent in working for my kids or my
students. I shouldn't say kids, I'm sorry.
For my students, and especially for, as I
indicated earlier, for Kendall, one of the
students that I put everything into.

HEARING OFFICER BUTLER-TRUESDALE:
Today is -- today is Tuesday. I'll give you

until Friday, but then I've got to give him

at least Monday and Tuesday to look at it.

And I don't think that at this particular

point, it should be anything -- I can't -- I

shouldn't say that. No, I'm not going to.

Let me back up.

MS. BERRY: Because we do believe

that he's owed compensatory education. And

if he's owed compensatory education, it must

be provided to him. And as a result, even

if he -- and which our hearing officer

needed for him to --

HEARING OFFICER BUTLER-TRUESDALE:

Do you understand? If you're going to give

me something, it should be a statement of

injurious impact as defined, or attempted to

define by -- attempting to define by grade

equivalency at start at High Roads, grade

equivalency now. And then some definition

of difference between the two, times three.

MS. CHAPMAN: Well, considering

that DCPS has not been released from this,

then I would just like to state for the

record that I don't see how a representative

from High Road, who met the child at this

point, is going to be able to, and who is
not an expert in the particular field --

HEARING OFFICER BUTLER-TRUESDALE:
But that's why I'm telling her I want grade
comparisons -- an analysis by grade
equivalency.

MR. DALTON: But I have to go on
the record and state that that is not what
Reed tells counsel they have to do. It
doesn't give me an opportunity to provide
any kind of a defense. The only thing I can
do is bring in a psychologist to say that,
"This is not the proper way to do it. It's
not -- you know you have to do this."

That's a standard you don't want
to impose, but that's what I believe Reed is
doing, just as there are a number of things
that are not fair about the new law, but
they're in the new law. So we have to live
with that. It's a matter of who a PR firm
gets to (inaudible).

HEARING OFFICER BUTLER-TRUESDALE:
And see, that's why -- that's why I'm not --
that's why I hear you. I know you do
zealous advocacy, and zealous advocacy

alone.  But that's why I said in the
beginning that I wasn't sure it was a good
investment of your time.  Because I -- I can
pretty much tell you that his response to it
is going to be more compelling to me than
what you  have drafted or created, because
he's not going to have as much of an
opportunity to present his case in
opposition to you.

        MS. BERRY:  Okay, however, I --

        HEARING OFFICER BUTLER-TRUESDALE:
So I'm going to have to give him more
deference that you and the amount of energy
that you put into it.

        MS. BERRY:  My only issue is that
I think you would be unfair and pretty much
against the purpose of IDEA, and the purpose
of as far as compensatory education is
concerned, to deny the student what in all
reality has been determined that comp ed;
that it's a result of a denial of fate.

        And I believe that it was already
determined in the HOD that there was a
denial of fate, and it's all a matter of
coming to a conclusion as far as that comp

ed must be provided to the student.

And unfortunately, the student's counsel, namely me, was under the impression that information I received was not what I needed to show that comp ed is required; was just to have someone come in, or even my phone, testify as to the need for comp ed, as to providing the student with what -- or rather to get him to where he would've been if not for the violation, and also to go hand in hand with IDEA so he can, according to IDEA, the purpose, so he can function either post graduate, or employment or just in the real world.

And that is clearly indicated under IDEA 2004, and it's spelled out completely. It's not something that -- that we're making up.

HEARING OFFICER BUTLER-TRUESDALE: So if we don't get the appropriate plan, petitioner doesn't waive it?

MS. BERRY: I'm sorry.

HEARING OFFICER BUTLER-TRUESDALE: If we don't get an appropriate plan, petitioner doesn't waive it?

MS. BERRY:  I mean honestly speaking --

HEARING OFFICER BUTLER-TRUESDALE: Doesn't waive the right to that.

MS. BERRY:  To?

HEARING OFFICER BUTLER-TRUESDALE: Comp ed.

MS. BERRY:  No, I don't believe he does, because --

MR. DALTON:  Well,

MS. BERRY:  -- number one, this is the first I'm hearing about having plans. What my understanding from Reed and other hearings I've had was that I needed somebody to show that the student needed compensatory education, not so much that I have to put together a complete plan.

HEARING OFFICER BUTLER-TRUESDALE: No, not needed.

MS. BERRY:  Well, that I had to --

HEARING OFFICER BUTLER-TRUESDALE: I don't -- I don't think that is the standard.  I think it's injurious impact of past denial of fate.  And then because we're

no longer allowed to, just as a matter of
fact, use hour-for-hour, not that you can't
use hour-for-hour, but that you have to
demonstrate that that is the appropriate
relief and why, then you've got to go
through all that wrangling about, "Here's
what we're suggesting and here's why."

        MS. BERRY:  And that's my point.

        HEARING OFFICER BUTLER-TRUESDALE:
But it's not this person on the phone.

        MS. BERRY:  And that's from my
understanding.  From I guess you call it
regular practice from other hearings I've
been to; that's what they required.  No one
has yet.  This is a first.  No one has yet
to ask me, "Well, I need something in
writing saying ABC and D."  What I need, and
when all this started, was I would come in
just like I always did (inaudible).

        HEARING OFFICER BUTLER-TRUESDALE:
But in the previous hearing, I said, "Give
me attendance records.  Give me grades."
Give me --

        MS. BERRY:  Because I was told I
could not be the one to provide it to the

hearing officer --

HEARING OFFICER BUTLER-TRUESDALE:
Yes, right.

MS. BERRY:   -- and to counsel.   I
could've easily done that, but I was told I
could not do that for whatever reason.   So
as a result, my communication with High Road
was that they sent it to the parties.   I
know Ms. Chapman has it, but I'm not sure
how.

HEARING OFFICER BUTLER-TRUESDALE:
Yes, I just got the -- the -- they just gave
me the attendance sheet.   I didn't get the
grades.

MS. BERRY:   See, I don't know
what happened with that.   And that's -- and
it's unfortunate that it happened.   But I
saw the grades.   He is -- has improved
tremendously from the grades he had from
Friendship Edison.

I mean I see some Bs.   I see some
B plus and B minus.   Yes, and he has some Cs
and what not, but basically he has improved
tremendously.   And that clearly shows that
if he had been or was receiving those

services appropriately at Friendship, he
more than likely would've still been getting
those grades that he's getting now, as
opposed to the Fs that he was getting at
Friendship.

I mean that's clear cut, and it's
there. And it shows the progress that he's
made. If he was still maintaining the Fs
and what not, then we can say, "Well, it
doesn't matter where he was. He just wasn't
producing. He just can't produce."

But obviously he can produce, and
he has made tremendous progress, and
Friendship is liable. No one else.
Friendship is liable. And for Friendship to
now -- for them to -- I guess I can only --

HEARING OFFICER BUTLER-TRUESDALE:
Where's the scheme? Where's the formula,
Ms. Berry?

MS. BERRY: As I indicated --

HEARING OFFICER BUTLER-TRUESDALE:
You have to go to another hearing at 3:00?

MS. CHAPMAN: No.

HEARING OFFICER BUTLER-TRUESDALE:
Okay, where is the scheme? Where is the

formula?

MS. BERRY:  As we indicated at the meeting what we offered, was simply that he -- and they indicated as such in the meeting notes that he could attend the -- a vocation program, or rather he could attend a vocational program, and in conjunction with finishing up his high school diploma at high road, so he can at the same time get the counseling and the -- the behaviors; all that taken care of at High Road, and at the same time do his vocational program.  And we all know that --

HEARING OFFICER BUTLER-TRUESDALE: But see, that's the thing; vocational programming.

MS. BERRY:  In design.

HEARING OFFICER BUTLER-TRUESDALE: What?

MS. BERRY:  In design.  This is vocational programming in design.

HEARING OFFICER BUTLER-TRUESDALE: What?  What is it?  Tell me.  What is it? How many hours.  What's the schedule? Where's the equation that I can use to say,

"Here's the injurious impact cause, and
there's the cost?"

      MS. BERRY:  See, and even that --

      HEARING OFFICER BUTLER-TRUESDALE:
And the remedy is nebulous at that.

      MS. CHAPMAN:  And also, just in
terms of DCPS; I mean our position, and
again, I keep coming back to this based on
the fact that we are still a party to this
case.  So based on that, I do think that
it's my obligation to my client to make sure
that I infuse statements where I think
they're necessary.

      And in terms of representation
from petitioner's counsel as to the grades,
and that the grades are -- that the student
is making progress while at High Road; and
our assertion is that that would go to the
fact that perhaps even less compensatory
education is owed.  Because if the student
has increased to a certain level that the
student wasn't at before, then that span
that is needed to get him to where he would
have been is shortened.

      We don't have a cognitive expert

here, or even a -- someone that can testify
to what his cognitive ability is, and based
upon the disability, what that cognitive
ability is, where he was when he left
Friendship Edison, and where he is now, and
based on his abilities, where we speculate
he would have been but for these alleged
denials.

And you need somebody that has
some experience and some where-with-all that
is not just a teacher at High Roads, to be
able to provide us with that information
before we can make any determination as to
compensatory education.

HEARING OFFICER BUTLER-TRUESDALE:
Now, if Kendall completes the remaining
coursework at High Roads, his age -- it puts
him -- does it put him right at his
birthday, or will he be able to finish the
semester, or?

MS. BERRY:  Yes, he'll be able to
finish.

MR. DALTON:  He can finish the
semester when he turns 22.  He only has to
get three credits to graduate.

HEARING OFFICER BUTLER-TRUESDALE:
And that -- that graduate -- that
matriculation again would take place back at
Burke or at High Roads?

PARTICIPANT:  High Roads.

MR. DALTON:  High Roads.

HEARING OFFICER BUTLER-TRUESDALE:
Ms. Berry, if I were in the -- in the
situation where I were facing electrocution,
you'd be the first person I'd call.  Because
I might live until  retirement age, as you
attempted to argue for me -- I can see that
I might be condemned to the chair, but you'd
be still arguing.

MR. DALTON:  She'd be arguing
even after they threw the switch.

HEARING OFFICER BUTLER-TRUESDALE:
So man, I'm honored by your commitment,
zealousness and professionalism.  Does
anyone else have anything else to say before
I go off the record?

MR. DALTON:  No.

HEARING OFFICER BUTLER-TRUESDALE:
No?  Thank you very much.

(Whereupon, the above-entitled

matter went off the record.)

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433   WASHINGTON, D.C. 20005-3701   (202) 234-4433